UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEJANDRO ARRIAGA,<br><br>　　　　Petitioner,<br><br>　　v.<br><br>M. E. SPEARMAN,<br><br>　　　　Respondent. | Case No. 17-cv-05112-EMC<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**<br><br>Docket No. 1 |

## I.　INTRODUCTION

Alejandro Arriaga filed this action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 to challenge his conviction from Santa Clara County Superior Court. Respondent has filed an answer to the petition. For the reasons discussed below, the petition will be denied.

## II.　BACKGROUND

A.　State Court Proceedings

The California Court of Appeal described the evidence at trial:

> On April 9, 2012, Jose Cano was having a party with about seven friends at his house, which was located on Luther Avenue in San Jose. His daughter Chanelle was also present. Defendant, who had not been invited, arrived at Cano's house at about 4:00 p.m. or 4:30 p.m. Defendant was drunk. Cano had previously spoken to defendant six to eight times and knew him as "Dro" and "Cabbage Patch." Cano asked defendant if he wanted a beer and defendant grabbed one. When one of Cano's friends said it was her beer, Cano told defendant to take the beer and leave. Defendant left.
>
> About 15 minutes later, defendant returned to Cano's house. Defendant was loud and obnoxious. Cano took defendant into his bedroom and told him that he was disrespecting him and his friends. Defendant responded by stating that he was a "Northerner," and "I'm from the west side." He also claimed, "This is my varrio," and "This is my hood." Cano told defendant to leave. When Cano thought defendant was going to hit him, he pushed him towards the

front door. Defendant stumbled and his red Chicago Bulls baseball cap fell off. As defendant left, he looked upset.

About 10 minutes after defendant left, Chanelle told Cano that someone was at the front door. Cano responded that he would answer the door. Both Cano and Chanelle heard defendant yell, "Hey, Joe." Immediately thereafter, three gunshots were fired. Everyone in the house hit the floor. One bullet struck the bedroom door frame to the left of where Cano was standing. Chanelle glanced out the window and saw defendant enter the front passenger seat of a black Dodge Magnum. Cano called 911.

Between 5:00 p.m. and 6:00 p.m. on April 9, 2012, Edward Armond was riding his bike to Cano's house to retrieve a tool that Cano had borrowed from him. When Armond was close to Cano's house, he heard a gunshot. As he pulled up to the entrance to Cano's driveway, he saw defendant's Dodge Magnum in the driveway and defendant pointing a gun at the front door of Cano's house. As Armond watched, defendant fired two more shots. Armond turned around and left.

The police retrieved a red Chicago Bull's baseball cap and two bullets from Cano's house. One bullet was lodged in the front door and the other was lodged in the bedroom door frame. The police also found a bottle of Corona beer in Cano's driveway.

When the police went to defendant's apartment, they saw a black Dodge Magnum with two male occupants driving on the street about 40 feet away from them. After the driver looked at the police and sped off, they chased the Dodge Magnum with their lights and siren on. The driver of the vehicle ran some red lights, drove up to 100 miles per hour, lost control, and crashed into two parked cars in a driveway. The driver, who was wearing a red shirt underneath a gray sweatshirt, exited the vehicle and ran. The police chased him, but he escaped by jumping over a fence. Meanwhile, defendant walked to the front door of the house and sat on the porch. The residents called 911. Defendant was wearing a gray and red sweatshirt and white shoes with red trim when he was arrested.

The police searched the Dodge Magnum, which had a strong odor of alcohol. They found a red and black baseball cap in rear of the vehicle and a baseball bat in the trunk. They did not find a gun in the vehicle or along the path that the driver had taken.

After transporting defendant to the police station, an officer conducted a gunshot residue test. A criminalist tested these samples and determined that there was gunshot residue on defendant's hands and the sleeves of his sweatshirt.

Detective Clayton Le testified as an expert on criminal street gangs in Santa Clara County. In Detective Le's opinion, defendant was a San Jose Norteno gang member based on the facts of the present case and his previous contacts with the police. Detective Le considered defendant's statements "I'm a Northerner, this is my hood" and "I'm west side," which he made to Cano. He explained that defendant's reference to "west side" indicated that he was a

2

Norteno gang member from the west side of San Jose. According to Detective Le, "West Side Mob" gang members refer to themselves as "west side" and their territory is near Luther Avenue where the shooting occurred in this case. Other subsets of Nortenos refer to other geographic areas: Roosevelt Park Locos say "north side"; El Hoyo Palmas (EHP) and other gangs on the east side of San Jose say "east side." He also explained that members of San Jose Norteno will use both Northerner and Norteno to describe themselves and that defendant's statement "this is my hood" indicated that he was claiming the neighborhood for his gang. Detective Le testified that Nortenos commonly wear red clothing and both defendant and the driver of the Dodge Magnum were wearing red clothing on the night of the shooting.

Detective Le also testified that defendant had been seen with two Norteno gang members, Michael Zapian and Robin Wanes, on prior occasions. In 2007, Zapian indicated to police that he had been hanging out with Horseshoe for one or two years. "Horseshoe" is a shortened form of Varrio Horseshoe, which is a subset of the Norteno gang in the Luther Avenue area. In 2009, the police stopped defendant and Zapian in the Luther Avenue area. On another occasion, police stopped defendant, Zapian, and Wanes in the Luther Avenue area. Wanes admitted that he was a San Jose Crip gang member. According to Detective Le, Crips and Nortenos associate with each other in San Jose.

Detective Le testified that he had conducted investigations involving several Norteno gang members. Ezekiel Tadeo and Justin de la Garza were convicted of assault with a deadly weapon with a gang enhancement after an incident in which a woman's hand was sliced. When police conducted a probation search of Jeremiah Garcia, who had a felony record for possession of narcotics, they found metal knuckles, a shotgun, and a stolen pistol. Robert Ebertowski was convicted of criminal threats with a gang enhancement after he threatened to kill some police officers. Jeremiah Rocho was convicted of attempted murder after he stabbed a Sureno gang member. Detective Le testified that other crimes committed by San Jose Nortenos include homicide, carjacking, shooting into homes or cars, kidnapping, car theft, arson, possession of illegal firearms, vandalism, and drug sales.

Detective Le described the structure of the Norteno gang. Nortenos are aligned with the Nuestra Familia prison gang, which was formed in response to the Mexican Mafia. Nuestra Raza is a "sort of junior varsity for Nuestra Familia, a way of being vetted ... before you become a full member of Nuestra Familia." "[A]ll these small gangs," such as EHP and Varrio Horseshoe, are required to pay dues to Nuestra Familia. These Nortenos are sent out to conduct narcotic sales or robberies to provide Nuestra Familia prison gang members with money to distribute to their family members. Some members of San Jose Norteno gangs work their way up to Nuestra Familia by showing that they are "down for the gang," meting out discipline, selling narcotics, and committing assaults. Nortenos are the dominant gang in Santa Clara County and "are more organized and structured because of the [Nuestra Familia] influence." There are over 500 members of San Jose Norteno in Santa Clara County.

> Detective Le discussed three predicate crimes committed by Norteno subsets. When the police arrested Manuel Fuentes, an EHP gang member, he was in possession of an illegal weapon. He pleaded guilty to ex-felon in possession of a handgun with a gang enhancement. Armando Mata and Manuel Sandoval, EHP members, stabbed the victim, who had objected to having them in his house. Mata and Sandoval were convicted of assault with a deadly weapon with a gang enhancement. Richard Lopez, a member of Chicano Pride Gangsters, stabbed a Sureno, who had been sitting in his car in a Norteno neighborhood. The victim recognized Lopez as a Norteno because he and Lopez had been in juvenile hall at the same time. Lopez was convicted of attempted murder with a gang enhancement and Britney Elaban, his accomplice, was convicted of accessory after the fact with a gang enhancement. Detective Le testified that each of the defendants in these cases stated that he was a Norteno. According to Detective Le, the subsets to which they belonged to were also Norteno. Based on these cases, Detective Le concluded that San Jose Norteno gang members engage in a pattern of criminal activity within the meaning of section 186.22.
>
> The parties stipulated that defendant was the registered owner of a black Dodge Magnum from January 11, 2011 to November 7, 2013. The parties also stipulated: defendant's DNA was located inside the Chicago Bulls baseball cap found in Cano's house; defendant's DNA was located inside the baseball cap found inside his Dodge Magnum; and defendant's fingerprints were on the bottle of Corona beer found on Cano's driveway.
>
> B. Uncharged Offenses
>
> On December 3, 2011, defendant was listening to loud music in his car while parked in front of his residence. The trunk and the car doors were open and defendant was drunk. Joseph Villalobos asked defendant to move his car and to stop making noise. Defendant became upset and told Villalobos that he "would kill people who bother him." Villalobos saw a black baseball bat in the trunk of the car and returned to his residence.
>
> The following day, Villalobos found that his car had been vandalized. The car no longer had windows and was "smashed all over." Villalobos found the aluminum bat, which he had previously seen in defendant's trunk, near his car. He contacted the police.

*People v. Arriaga*, No. H040529, 2016 WL 2595789, at *1-4 (Cal. Ct. App. May 3, 2016).

Following the jury trial in Santa Clara County Superior Court, Mr. Arriaga was convicted of shooting at an inhabited dwelling, *see* Cal. Penal Code § 246, and attempted murder, *see id.* at §§ 187, 664(a). The jury also found that Mr. Arriaga committed both offenses for the benefit of a criminal street gang, *see id.* § 186.22(b)(1)(C), and that he personally discharged a firearm during the commission of the attempted murder, *see id.* at § 12022.53(b)&(c). He was sentenced to 35

years to life in prison. *Arriaga*, 2016 WL 2595789, at *1.

Mr. Arriaga appealed. The California Court of Appeal eventually affirmed his conviction and the California Supreme Court denied his petition for review.

Mr. Arriaga then filed this action, seeking a federal writ of habeas corpus. Mr. Arriaga alleges in his petition for writ of habeas corpus that his right to due process was violated because the evidence was insufficient to support the gang enhancement.

Respondent has filed an answer. Mr. Arriaga has not filed a traverse, and the deadline by which to do so has long passed. The matter is now ready for decision.

### III.  JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this action for a writ of habeas corpus under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the petition concerns the conviction and sentence of a person convicted in Santa Clara County, California, which is within this judicial district. 28 U.S.C. §§ 84, 2241(d).

### IV.  STANDARD OF REVIEW

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The Antiterrorism And Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new restrictions on federal habeas review. A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

5

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was 'objectively unreasonable.'" *Id.* at 409.

The state-court decision to which § 2254(d) applies is the "last reasoned decision" of the state court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991). "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst*, 501 U.S. at 803. When confronted with an unexplained decision from the last state court to have been presented with the issue, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). The presumption that a later summary denial rests on the same reasoning as the earlier reasoned decision is a rebuttable presumption and can be overcome by strong evidence. *Kernan v. Hinojosa*, 136 S. Ct. 1603, 1605-06 (2016).

## V. DISCUSSION

A. <u>Sufficiency of the Evidence Claims</u>

Mr. Arriaga contends that his right to due process was violated because the evidence was insufficient to support the sentence enhancements he received under California Penal Code § 186.22(b)(1)(4) for committing his crimes to benefit a criminal street gang.[1] His claims regarding the sufficiency of the evidence do not pertain to the evidence about his own actions, and instead

---

[1] Mr. Arriaga received an indeterminate term enhancement under § 186.22(b)(4) on count 1 (shooting at an inhabited dwelling) and received a 10-year enhancement under § 186.22(b)(1)(C) for count 2 (attempted murder). *See* CT 566-68.

6

pertain to the actions of the criminal street gang for whose benefit he committed his crimes. Under the statute, several particular criteria must be met to determine that there is a criminal street gang, and Mr. Arriaga's claims concern whether those criteria were satisfied.

Mr. Arriaga attacks the sufficiency of the evidence in two particular ways. First, he contends that the prosecution did not show the necessary "pattern of criminal gang activities" because there was insufficient evidence to connect the San Jose Norteno gang that Mr. Arriaga allegedly sought to benefit with the gang subsets that committed the predicate crimes. Second, Mr. Arriaga contends that there was insufficient evidence to show that the commission of the statutorily enumerated crimes was one of the criminal street gang's "primary activities."

### 1. Ascertaining Who Is Part Of The "Criminal Street Gang" For Purposes of Determining Whether A "Pattern Of Criminal Gang Activity" Has Been Shown

California Penal Code § 186.22(b) provides for sentence enhancements for any person convicted of a felony "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." Cal. Penal Code § 186.22(b)(1) (effective Sept. 29, 2011-Dec. 31, 2013).

A "criminal street gang" is defined in the statute as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of" certain enumerated crimes, "having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." Cal. Penal Code § 186.22(f). A "pattern of criminal gang activity" is defined as the commission of, the attempted commission of, the conspiracy to commit, or the solicitation of, certain predicate offenses. Cal. Penal Code § 186.22(e), (j). The list of predicate offenses includes the commission and attempted commission of more than thirty different crimes, including assault with a deadly weapon, robbery, murder, manslaughter, sale of controlled substances, shooting at an inhabited dwelling or occupied motor vehicle, and certain firearms-related offenses. *See* Cal. Penal Code § 186.22(e).

In some cases, as here, the prosecution attempts to prove the existence of a criminal street gang based on the conduct of smaller subsets of that gang. The California Supreme Court

7

addressed this issue in *People v. Prunty*, 62 Cal. 4th 59, 71 (Cal. 2015).[2] The *Prunty* court interpreted California Penal Code § 186.22 to require the following:

> [W]here the prosecution's case positing the existence of a single "criminal street gang" for purposes of section 186.22(f) turns on the existence and conduct of one or more gang subsets, then the prosecution must show some associational or organizational connection uniting those subsets. That connection may take the form of evidence of collaboration or organization, or the sharing of material information among the subsets of a larger group. Alternatively, it may be shown that the subsets are part of the same loosely hierarchical organization, even if the subsets themselves do not communicate or work together. And in other cases, the prosecution may show that various subset members exhibit behavior showing their self-identification with a larger group, thereby allowing those subsets to be treated as a single organization.

*Id.* at 71-72. It is not enough to introduce evidence of different subsets' activities without showing that the subsets "are somehow connected to each other or another larger group." *Id.* There must be evidence to permit the jury to conclude that those who committed the predicate acts belong to the same gang that the defendant acted to benefit. *Id.* at 76.

*Prunty* provided examples of how the prosecution could show a criminal street gang to exist when the prosecution posits that gang subsets should be treated as a single criminal street gang. *See id.* at 76-77. One example in *Prunty* is particularly important: "Subsets may . . . be linked together as a single 'criminal street gang' if their independent activities benefit the same (presumably higher ranking) individual or group. An example would be various Norteno subset gangs that share a cut of drug sale proceeds with the same members of the Nuestra Familia prison gang." *Id.* at 77.

---

[2] In *Prunty*, the prosecution sought to show that the Sacramento-area Nortenos was a criminal street gang based on commission of predicate offenses by subset Nortenos gangs that were smaller groups that sometimes "claimed" different neighborhoods in Sacramento but allegedly worked for the benefit of the Sacramento-area Nortenos. The defendant in *Prunty* was in the Detroit Boulevard Nortenos subset of the Sacramento-area Nortenos gang, and the expert testified as to predicate offenses committed by the Varrio Gardenland Nortenos subset and the Del Paso Heights Nortenos subset of the Sacramento-area Nortenos gang. *Prunty*, 62 Cal. 4th at 67, 69. The gang enhancement was overturned in *Prunty* because the expert did not provide evidence showing that these subsets identified with a larger Norteno group or that the subsets that had committed the predicate offenses shared a connection with each other or with any other Norteno-identified subset. *Id.* at 69.

a. California Court of Appeal's Rejection Of Mr. Arriaga's Claim

The California Court of Appeal rejected Mr. Arriaga's contention that the evidence was insufficient to support the gang enhancement he received. That court identified the standard for reviewing the sufficiency of the evidence: "'[W]e review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'" *Arriaga*, 2016 WL 2595789, at *4 (alteration in original) (quoting *People v. Albillar*, 51 Cal. 4th 47, 60 (Cal. 2010)). The California articulation of the sufficiency of the evidence standard is to comply with the federal constitutional requirements in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). *See People v. Johnson*, 26 Cal. 3d 557, 575-76 (Cal. 1980) ("California decisions state an identical standard" to that in *Jackson*).

The state appellate court relied on *Prunty* to determine that there was sufficient evidence linking the subset San Jose Norteno gangs that committed the predicate offenses to the San Jose Norteno gang so as to permit a reasonable jury to find that Mr. Arriaga committed the shooting to benefit the same gang that did the predicate acts. The state appellate court recognized that, under *Prunty*, subsets could be linked together as a single criminal street gang "'if their independent activities benefit the same (presumably higher ranking) individual or group,'" such as when Norteno subset gangs "'share a cut of drug sale proceeds with the same members of the Nuestra Familiar prison gang.'" *Arriaga,* 2016 WL 2595789, at *5 (quoting *Prunty*, 62 Cal. 4th 77).

> Here, Detective Le testified that "all these small" Norteno street gangs in Santa Clara County, that is, the subsets of the Norteno gang, pay a portion of the proceeds from narcotic sales or robberies as dues to the Nuestra Familia prison gang. Thus, there was sufficient evidence to support the finding of an organizational connection uniting the Norteno gang that defendant sought to benefit and the Norteno subsets, who committed the predicate crimes.

*Arriaga*, 2016 WL 2595789, at *5.

b. Analysis Of Federal Constitutional Claim

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). A court reviewing a conviction does not

determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt, but rather determines whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt may a court conclude that the evidence is insufficient. *See Jackson,* 443 U.S. at 324. The "prosecution need not affirmatively 'rule out every hypothesis except that of guilt,'" and the reviewing federal court "'faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Wright v. West*, 505 U.S. 277, 296-97 (1992) (quoting *Jackson*, 443 U.S. at 326).

The *Jackson* standard also applies to state sentence enhancements: a petitioner can obtain habeas relief if no rational trier of fact could find the elements of the enhancement true beyond a reasonable doubt. *Garcia v. Carey*, 395 F.3d 1099, 1102 (9th Cir. 2005).

"*Jackson* leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'" *Coleman v. Johnson*, 566 U.S. 650, 655 (2012) (per curiam) (quoting *Jackson*, 443 U.S. at 319). "[O]n habeas review, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge" unless "the state court decision was objectively unreasonable." *Id.* at 651 (internal quotation marks omitted).

The *Jackson* standard is applied to a crime as that crime is defined by state law. *Jackson*, 443 U.S. at 324 n.16. The California Supreme Court's interpretation of California law is binding in this federal habeas action. *See Hicks v. Feiock*, 485 U.S. 624, 629-30 (1988). That is, this Court's analysis begins with an acceptance that the law of California is that an enhancement under California Penal Code § 186.22(b)(1) may be applied under the circumstances described by the California Supreme Court in *Prunty*. More specifically, this Court's analysis begins with an acceptance that, for purposes of showing a criminal street gang, subsets of the gang may be linked together as a single criminal street gang if their independent activities benefit the same,

10

presumably higher-ranking, group. *See Prunty*, 62 Cal. 4th at 77.

Here, the California Court of Appeal reasonably rejected Mr. Arriaga's claim that the evidence was insufficient to link the subsets together into a single criminal street gang, the San Jose Norteno. Under California law, a criminal street gang can be shown based on the activities of different subsets if there is "some associational or organizational connection uniting those subsets." *Prunty,* 62 Cal. 4th at 71. One way to link the gang subsets is to show different gang subsets engaging in independent activities to benefit the larger gang, such as when subset gangs share a cut of drug sale proceeds with the one prison gang that is at the pinnacle of that larger criminal street gang. *See Prunty*, 62 Cal. 4th at 77.

Detective Le gave his expert opinion that the San Jose Norteno qualified as a criminal street gang under California law. RT 80. He also testified about the organization of the red, or Norteno, gangs in California. At the top of the red, or Norteno, gangs was the Nuestra Familia, a highly structured prison gang that sent its members to the counties to run the county-level organizations. RT 836-37; *see also* RT 220 (Nortenos claim the color red and are aligned with Nuestra Familia). Detective Le also testified that there was the San Jose Norteno gang and that the San Jose Norteno gang had several subset gangs under it, including West Side Mob, El Hoyo Palmas (EHP), and Barrio Horseshoe or Varrio Horseshoe. *See* RT 836 (the San Jose Norteno gang has subsets), 216 (West Side Mob and Barrio Horseshoe), 218 (Varrio Horseshoe), 768 (El Hoyo Palmas). Detective Le also stated that Nuestra Familia gets dues from narcotics sales and robberies committed by Norteno gangs. RT 837. He agreed that the money from the narcotics sales and robberies "goes up from EHP and all these small gangs like Horseshoe. These Nortenos, all these Norteno gangs are required to pay tribute to these prison gangsters." RT 837. Detective Le also agreed "that the Norteno street gangs in Santa Clara County are often expected to pay dues to Nuestra Familia." RT 221. The dues were required because the Nuestra Familia members did not have a direct source of income while in prison so they "send these street-level criminals, these gang members, the Nortenos, out to conduct narcotic sales, um, and they bring in the money and they send the money then to the prison gang members." RT 221-22. The California Court of Appeal reasonably determined that detective Le's testimony provided sufficient evidence to show

11

an associational or organizational connection uniting the San Jose Norteno gang subsets. Unlike *Prunty* (*see* footnote 3, *supra*), there was an adequate showing here of an organizational connection between the San Jose Norteno subsets.

Because this evidence linked the subsets of the San Jose Norteno, the jury could permissibly look to the predicate acts committed by members of several subsets of the San Jose Norteno gang to determine that the prosecution had proven beyond a reasonable doubt that the San Jose Norteno was a criminal street gang whose "members individually or collectively engage in or have engaged in a pattern of criminal gang activity." Cal. Penal Code § 186.22(f). The testimony of Detective Le established that the San Jose Norteno criminal street gang's members had committed these predicate acts to show a pattern of criminal gang activity: (a) Manuel Fuentes (in the EHP gang subset) had been convicted of being a felon in possession of a firearm with a gang enhancement; (b) Armando Mata and Manuel Sandoval (both in the EHP gang subset) had been convicted of assault with a deadly weapon with a gang enhancement; and (c) Richard Lopez (in the Chicano Pride Gangsters gang subset) had been convicted of attempted murder with a gang enhancement. RT 764-73. Detective Le further testified that these four persons had admitted to being Nortenos. Detective Le also gave his expert opinion that the San Jose Norteno members engaged in a pattern of criminal activity within the meaning of § 186.22. RT 774. Mr. Arriaga does not challenge the evidence showing that these convictions occurred or were gang-related – the evidence is mentioned here only to complete the analysis on his due process claim which challenges the sufficiency of the evidence that these crimes were committed by members of the same criminal street gang that Mr. Arriaga sought to benefit by shooting at Mr. Cano and Mr. Cano's house.

Given the foregoing evidence, it was not an unreasonable application of *Jackson* for the California Court of Appeal to conclude that there was sufficient evidence to permit the jurors to draw the reasonable inference that the San Jose Norteno gang's members engaged in a pattern of criminal gang activity. It cannot be said that the California Court of Appeal's rejection of Mr. Arriaga's due process challenge to the sufficiency of the evidence was "objectively unreasonable." *See Coleman*, 566 U.S. at 651. Mr. Arriaga therefore is not entitled to the writ of habeas corpus

on this claim.

### 2. The "Primary Activities" Requirement

Mr. Arriaga also contends that the evidence was insufficient to prove that the alleged criminal street gang had "as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive of subdivision (e)." Cal. Penal Code § 186.22(f). The enumerated crimes in § 186.22(e) include assault with a deadly weapon, robbery, unlawful homicide or manslaughter, sale of controlled substances, and shooting at an inhabited dwelling.

The California Court of Appeal rejected Mr. Arriaga's contention that there was insufficient evidence to support the "primary activities" criteria for determining the existence of a criminal street gang for purposes of the gang enhancement finding.

> "The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations. [Citation.]" (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323 (*Sengpadychith*).) "Sufficient proof of the gang's primary activities might consist of evidence that the group's members consistently and repeatedly have committed criminal activity listed in the gang statute." (*Id.* at p. 324.) "Also sufficient [to show the gang's primary activities] might be expert testimony," i.e., testimony by a gang expert based on the expert's conversations with gang members, the expert's personal investigations of gang crimes, and information the expert has obtained from other law enforcement officers. (*Ibid.*)
>
> Here, Detective Le testified as an expert regarding criminal street gangs in Santa Clara County. He had received over 175 hours of formal gang training and had been a member of the Gang Investigation Unit for nearly two years. He had participated in over a hundred gang investigations, which involved crimes committed by Nortenos. Detective Le had also talked to over 200 gang members about gangs and gang lifestyles. Detective Le opined that San Jose Nortenos met the definition of a criminal street gang under section 186.22 based on his training, experience, and contact with gang members. His own participation in investigations of Norteno gang members involved those who were convicted of assault with a deadly weapon, illegal possession of a firearm, and attempted murder. He also based his opinion on court records of other Norteno gang members who were convicted of these same offenses. According to Detective Le, other crimes committed by San Jose Norteno gang members included homicide, carjacking, shooting into homes or cars, kidnapping, car theft, arson, possession of illegal firearms, vandalism, and drug sales. Detective Le subsequently identified murder, assault with a deadly weapon, illegal possession of a firearm, shooting into an occupied dwelling, and attempted

|   |   |
|---|---|
| 1 | murder as the primary activities of San Jose Nortenos.[2] |
| 2 | [Footnote 2:] Defendant argues that Detective Le never offered an opinion as to the primary activities of San Jose Nortenos. We disagree. Detective Le testified that section 186.22 defines a criminal street gang as including, among other things, members who "collectively or individually participate in a pattern of criminal activity whose primary activity is one of the enumerated offenses of 186.22 previously referred to, the murder, the assault with a deadly weapon, illegal possession of a firearm, shooting into an occupied dwelling." (Italics added.) [RT 788.] Detective Le had previously testified that San Jose Nortenos committed these offenses. |

*Arriaga*, 2016 WL 2595789, at *5 (last two bracket sets added).

The California Court of Appeal's rejection of Mr. Arriaga's challenge to the sufficiency of the evidence to satisfy the "primary activities" criteria for defining a criminal street gang was not contrary to or an unreasonable application of clearly established law from the U.S. Supreme Court. As explained above, *Jackson* requires a reviewing court to view the evidence in the light most favorable to the prosecution and determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319. The California Court of Appeal articulated the correct standard, as mentioned earlier, and reasonably applied it.

Based on the evidence at trial, the California Court of Appeal reasonably could conclude that the evidence permitted a reasonable determination by the jury that the "'commission of one or more of the statutorily enumerated crimes is one of the group's "chief" or "principal" occupations'" and therefore that the "primary activities" test was established. *Arriaga*, 2016 WL 2595789, at *5.[3] Specifically, Detective Le's expert testimony provided the necessary proof.

---

[3] The jury instruction on a criminal street gang included the following language:

> A criminal street gang is any ongoing organization, association, or group of three or more persons, whether formal or informal:
>
> 1. That has a common name or common identifying sign or symbol;
>
> 2. That has, as one or more of its *primary activities*, the commission of attempted murder, assault with a deadly weapon, or illegal possession of a firearm;
>
> AND

14

Detective Le testified about his experience and knowledge about criminal street gangs in Santa Clara County: he had over 175 hours of formal training in gangs; had been a member of the gang investigation unit in the police department for the last two years (and, until recently, specialized in Norteno crimes); had spoken to more than 200 gang members (about 75% of whom were in San Jose Norteno) about gangs and their lifestyles; had observed Norteno gang members; and took part in over 100 gang investigations regarding crimes committed by Norteno gang members. RT 66-72. The court accepted him as an expert and permitted him to give an expert opinion "on the subject of criminal street gangs in Santa Clara County." RT 75.

Detective Le, using a Powerpoint presentation he had prepared, then discussed at length the San Jose Norteno gang; his presentation included going through the definition of a criminal street gang under California Penal Code § 186.22. RT 78. He explained that § 186.22 provides a specific definition of a gang, and that he was using that definition. Thus, he explained that the enumerated crimes that are the primary activities needed for a group to be a gang "are listed in the statute," and included crimes such as assault with a deadly weapon, robbery, murder, rape, car theft, and attempted murder. RT 79. (All of these offenses are among the enumerated crimes that must be the primary activities of the gang. See Cal. Penal Code § 186.22(e), (f).) After mentioning the criteria for a group to be a criminal street gang under § 186.22, Detective Le testified that he believed that the San Jose Norteno qualified as a street gang under the statute. RT 80. By definition, this included the fact that primary activities of the San Jose Norteno included the commission of the enumerated crimes. Detective Le testified that the crimes committed by the San Jose Norteno members included assaults with a deadly weapon, attempted murders, criminal threats, homicide, carjacking, shooting into homes or cars, kidnapping, car theft, arson, possession

---

> 3. Whose members, whether acting alone or together, engage in or have engaged in a pattern of criminal gang activity.
>
> In order to qualify as a *primary activity*, the crime must be one of the group's chief or principal activities rather than an occasional act committed by one or more persons who happen to be members of the group.

CT 554 (emphasis added) (CALCRIM 1401 (Spring 2012 ed.)).

15

1    of illegal firearms, vandalism, and drug sales. RT 83-84. (All of these offenses are among the
2    enumerated crimes that must be the primary activities of the gang. See Cal. Penal Code §
3    186.22(e), (f).)

4    Detective Le also provided information about specific cases to demonstrate that the San
5    Jose Norteno members had engaged in the particular criminal acts enumerated in § 186.22(e): (a)
6    Manuel Fuentes (in the EHP gang subset) had been convicted of being a felon in possession of a
7    firearm with a gang enhancement; (b) Armando Mata and Manuel Sandoval (both in the EHP gang
8    subset) had been convicted of assault with a deadly weapon with a gang enhancement; and (c)
9    Richard Lopez (in the Chicano Pride Gangsters gang subset) had been convicted of attempted
10   murder with a gang enhancement. RT 764-73. Additionally, Detective Le testified about other
11   crimes enumerated in § 186.22(e) that had been committed by other members of the San Jose
12   Norteno: (a) Ezekiel Tadeo and Justin de la Garza had been convicted of assault with a deadly
13   weapon for slicing a woman's hand; (b) Jeremiah Garcia (who had a felony record for possession
14   narcotics) was found to have metal knuckles, a shotgun and a stolen pistol; (c) Robert Ebertowski
15   had been convicted of making criminal threats with a gang enhancement after he threatened to kill
16   some police officers; and (d) Jeremiah Rocho had been convicted of attempted murder after he
17   stabbed a Sureno gang member. RT 82-83.

18   Given the foregoing evidence, it was not an unreasonable application of *Jackson* for the
19   California Court of Appeal to conclude that there was sufficient evidence to permit the jurors to
20   draw the reasonable inference that the "primary activities" criteria was established. Under
21   California law, as pronounced by the California Supreme Court, "[s]ufficient proof of the gang's
22   primary activities might consist of evidence that the group's members *consistently and repeatedly*
23   have committed criminal activity listed in the gang statute. Also sufficient might be expert
24   testimony" of the primary activities of the gang. *People v. Sengpadychith*, 26 Cal. 4th 316, 324
25   (Cal. 2001).

26   The California Court of Appeal reasonably could have concluded that there was sufficient
27   evidence to permit the jury to conclude that the San Jose Norteno had "as one of its primary
28   activities the commission of one or more of the criminal acts enumerated" in paragraphs (1) to

16

1  (25) [of § 186.22(e)]." Cal. Penal Code § 186.22(f).

It cannot be said that the California Court of Appeal's rejection of Mr. Arriaga's due process challenge to the sufficiency of the evidence was "objectively unreasonable." *See Coleman*, 566 U.S. at 651. Mr. Arriaga therefore is not entitled to the writ of habeas corpus on his claim. The California Court of Appeal could reasonably conclude that a rational trier of fact could have found that the commission of the statutorily enumerated crimes was one of the criminal street gang's "primary activities."

B.  No Certificate Of Appealability

A certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c). This is not a case in which "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Accordingly, a certificate of appealability is **DENIED**.

## VI. CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is **DENIED** on the merits. The Clerk shall close the file.

**IT IS SO ORDERED**.

Dated: August 14, 2018

_____
EDWARD M. CHEN
United States District Judge

17